# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WILLIAM JOSEPH STARTZ,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

      Defendant.

No. 12 C 5240

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Startz filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for supplemental security income (SSI) benefits. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

In addition, in cases such as the one before the Court, where an individual is determined to be disabled and entitled to benefits for a closed period, the Commissioner uses an eight-step sequential process to determine whether the claimant's disability continues. 20 C.F.R. § 404.1594(f); *see Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1028 (N.D. Ill. 2009). In applying the eight-step process, the Commissioner must determine:

1. Has the claimant engaged in any substantial gainful activity?
2. If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment?
3. If not, has there been a medical improvement as shown by a decrease in medical severity?
4. Is the medical improvement related to the claimant's ability to do work?
5. If no to steps three and four, do any exceptions to medical improvement apply?
6. If yes to step four, are the claimant's current impairments severe in combination?
7. If the impairments are severe, can the claimant perform his past relevant work?
8. If not, can the claimant perform any other work?

20 C.F.R. § 404.1594(f); *see Phillips*, 601 F. Supp. 2d at 1028; *O'Reilly v. Astrue*, No. 11 C 1409, 2012 WL 1068780, at *7 (N.D. Ill. March 29, 2012).

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on October 2, 2006, alleging that he became disabled on December 17, 2002, because of crushed right foot, heart condition, carpel tunnel syndrome, and a pinched nerve in the left arm. (R. at 17, 39). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request

for a hearing. (*Id.* at 17; 31–53). On August 20, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 17; 506–44). The ALJ also heard testimony from Ashok G. Jilhewar, M.D., a medical expert (ME), and Thomas A. Grzesik, a vocational expert (VE). (*Id.*).

The ALJ issued a partially favorable decision on February 23, 2011. (R. at 17–29). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since December 17, 2002, the alleged onset date. (*Id.* at 20). At step two, the ALJ found that prior to January 12, 2004, Plaintiff's status post-surgery of the right knee and status post-surgery of the right ankle were severe impairments. (*Id.*). At step three, the ALJ determined that, between December 17, 2002, and January 12, 2004, Plaintiff's knee and ankle impairments medically equaled the criteria of Listing 1.02(A). (*Id.* at 21–22). Accordingly, the ALJ concluded that Plaintiff was suffering from a disability as defined by the Act from December 17, 2002, through January 13, 2004. (*Id.* at 22).

The ALJ then determined that medical improvement occurred as of January 13, 2004, and applied the eight-step sequential evaluation process applicable to medical improvement cases. At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since December 21, 2006, the alleged onset date (R. at 20). At step two, the ALJ determined that beginning on January 13, 2004, Plaintiff's impairment did not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 23). At steps three and four, the ALJ found that a medical improvement occurred as of January 13, 2004, which was related to Plain-

tiff's ability to work. (*Id.* at 23). Because the ALJ found that a medical improvement had occurred, step five is inapplicable here. At step six, the ALJ found that beginning on January 13, 2004, Plaintiff's status post-surgery of the right knee, status post-surgery of the right ankle, degenerative disc disease of the thoracic spine, and degenerative disc disease of the cervical spine are severe impairments. (*Id.* at 20).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that beginning on January 13, 2004, Plaintiff had the RFC

> to perform less than the full range of light work, as defined in 20 C.F.R. § 404.1567(b). [Plaintiff] can never climb ropes, ladders, or scaffolds. [Plaintiff] is limited to no overhead reaching. [Plaintiff] can occasionally climb ramps and stairs, balance[,] kneel, crouch or crawl. [Plaintiff] is to avoid heights and moving machinery.

(R. at 23). Based on Plaintiff's RFC, the ALJ determined at step seven that beginning on January 13, 2004, Plaintiff has been unable to perform any past relevant work. (*Id.* at 27). At step eight, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as a products assembler, small parts assembler, and electronics worker. (*Id.* at 27–28). Accordingly, the ALJ concluded that beginning on January 13, 2004, Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 29).

The Appeals Council denied Plaintiff's request for review on April 13, 2012. (R. at 6–8). Plaintiff now seeks judicial review of the ALJ's decision, which stands as

---

[3] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from

the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff was employed as an iron worker from 1971 to 2002. (R. at 102). He was injured in December 2002 when an I-beam rolled over onto his right leg. (*Id.* at 508, 510). After x-rays of Plaintiff's right ankle were performed, Vimal Patel, D.O. diagnosed a talar dome fracture and ankle contusion. (*Id.* at 141). Plaintiff began physical therapy on February 3, 2003. (*Id.* at 163). On February 25, 2003, Dale J. Buranosky, D.P.M., Plaintiff's podiatrist, diagnosed crush injury, medial collateral sprain, probable avulsion type fracture of the talar dome, and neurapraxia in the tibialis posterior nerve.[4] (*Id.* at 148).

Plaintiff began treating with Armen S. Kelikian, M.D. on March 10, 2003. (R. at 500–02). Plaintiff complained of discomfort in his right knee and ankle, which bothers him with activity, resulting in pain. (*Id.* at 500). Dr. Kelikian reviewed Plaintiff's medical records and conducted an examination. (*Id.* at 500–01). He diagnosed ossicles of the ankle, OCD and an anterior spur, and ordered an MRI of Plaintiff's

---

[4] Neurapraxia is "[i]njury to a nerve resulting in paralysis but unattended by degeneration and followed by rapid and complete recovery of function." *Stedman's Medical Dictionary* 944 (5th ed. 1982).

knee.[5] (*Id.* at 501). The MRI revealed a medial meniscus tear and a small joint effusion. (*Id.* at 494, 162). Plaintiff underwent knee and ankle surgeries on July 16, 2003. (*Id.* at 170–72, 489–91).

On July 25, 2003, Dr. Kelikian found full range of motion without tenderness and recommended physical therapy. (R. at 488). On August 15, 2003, Plaintiff presented with some posterior tibial discomfort. (*Id.* at 487). Upon examination, Dr. Kelikian found some pain but good alignment and position and full range of motion. (*Id.*). He recommended continuing physical therapy, beginning full weight bearing, and ordered an ultrasound. (*Id.*). The ultrasound results were unremarkable. (*Id.* at 484, 485). On September 12, 2003, Plaintiff complained of pain medial and lateral and mildly over the dorsal cutaneous nerve. (*Id.* at 484). Upon examination, Dr. Kelikian found full range of motion and recommended four more weeks of physical therapy. (*Id.*). On December 1, 2003, Dr. Kelikian diagnosed posterior tibial tendonitis, recommended orthotics, and requested a functional capacity evaluation.[6] (*Id.* at 479).

On January 12, 2004, Plaintiff presented with plantar fascia pain and mild posterior tibia pain. (R. at 477). The results of Dr. Kelikian's examination were "unre-

[5] Ossicles in the ankle are extra bones, which can cause a problem if they are displaced. <www.ankle-arthroscopy.co.uk/patients-site/ossicles/> Osteochondritis dissecans (OCD) "is a joint disorder in which cracks form in the articular cartilage and the underlying subchondral bone." <en.wikipedia.org/wiki/Osteochondritis_dissecans>

[6] "A functional capacity evaluation (FCE) is set of tests, practices and observations that are combined to determine the ability of the evaluated to function in a variety of circumstances, most often employment, in an objective manner." <en.wikipedia.org/wiki/Functional_capacity_evaluation>

markable." (*Id.*). Plaintiff was "tender over the plantar fascia. He has full range of motion and strength. Neurological exam is negative." (*Id.*). Dr. Kelikian opined that Plaintiff has reached maximum medical improvement[7] and observed that the FCE found Plaintiff able to return to work at medium-level duty.[8] (*Id.*). On the same day, Dr. Kelikian completed a Work Status form, releasing Plaintiff to work "within FCE guidelines/restrictions, medium, sedentary functional demand level." (*Id.* at 478).

On March 8, 2004, Plaintiff reported mild discomfort. (R. at 476). Upon examination, Dr. Kelikian noted some tenderness "over the posterior tibial tendon subjectively" but found full range of motion of the ankle with no swelling and no effusion. (*Id.*). He reiterated that Plaintiff "can return to work within the restrictions of his FCE." (*Id.*). On June 4, 2004, Plaintiff reported persistent pain. (*Id.* at 475). Dr. Kelikian noted that Plaintiff's "EMG studies and ultrasounds have all been normal." (*Id.*). He found full range of motion, tenderness proximal to ankle over the tibia, and sensor and motor intact. (*Id.*). Dr. Kelikian again concluded that Plaintiff had reached MMI and that he can work within his FCE restrictions. (*Id.*). On September 10, 2004, Plaintiff reported "doing well." (*Id.* at 473). Dr. Kelikian found

_____

[7] "Maximum medical improvement (MMI) occurs when an injured employee reaches a state where his or her condition cannot be improved any further or when a treatment plateau in a person's healing process is reached. It can mean that the patient has fully recovered from the injury or that the patient's medical condition has stabilized to the point that no major medical or emotional change can be expected in the injured workers' condition. At that point, no further healing or improvement is deemed possible and this occurs despite continuing medical treatment or rehabilitative programs the injured worker partakes in." <en.wikipedia.org/wiki/Maximum_medical_improvement>

[8] Plaintiff's FCE is not included in the medical record. (*See* R. at 524–25).

some tenderness but noted good alignment and position and negative x-rays. (*Id.*).
He again opined that Plaintiff "is MMI from my point of view." (*Id.*).

On January 17, 2005, Dr. Kelikian referred Plaintiff to Erin L. Arnold, M.D. for ultrasound-guided intervention of his right ankle pain. (R. at 346). On February 28, 2005, Dr. Arnold noted some tenderness but full range of motion. (*Id.* at 345). She diagnosed right ankle pain with posterior tibial tendinosis and calcification within the deltoid ligament. (*Id.*). On April 8, 2005, Plaintiff reported the ability for increased activity, with less foot pain. (*Id.* at 343). On examination, Dr. Arnold found Plaintiff able to ambulate without difficulty, 5/5 muscle strength in lower extremities, but some tenderness to palpation along right posterior tibial tendon and deltoid ligament. (*Id.*). She diagnosed right ankle pain with posterior tibial tendinosis and calcification within the deltoid ligament, with residual symptoms, and sciatica. (*Id.*). On May 20, 2005, Plaintiff reported being generally symptom-free; he was able to ambulate in stores and do some yard work without difficulty. (*Id.* at 342). Dr. Arnold found 5/5 muscle strength in Plaintiff's lower extremities, but some tenderness to palpation along right posterior tibial tendon and deltoid ligament. (*Id.*). On July 15, 2005, Plaintiff reported being able to drive short distances without pain. (*Id.* at 341). However, he does have pain after long periods of ambulation. (*Id.*). On November 21, 2005, Plaintiff reported "doing pretty well." (*Id.* at 340). He was able to perform daily living activities without problem. (*Id.*). He has intermittent pain, which is improved with 10 to 20 minutes of rest. (*Id.*). Dr. Arnold diagnosed right

ankle posterior tibial tendonitis and deltoid ligament calcification, and an inability to ambulate or stand beyond 20 minutes. (*Id.*).

On March 9, 2005, Plaintiff began treating with Gregory Ozark, M.D. (R. at 428–29). Plaintiff had multiple complaints, including lower back pain. (*Id.* at 429). On March 31, 2005, Plaintiff reported doing better with medications. (*Id.* at 428). On examination, Dr. Ozark found no tenderness or mass; full and painless lumbosacral range of motion; straight leg raise negative at 90° on both sides;[9] normal deep tendon raises, and motor strength and sensation, including heel and toe gait; and hips and knees have full range of motion. (*Id.*). On April 29, 2005, Plaintiff reported excellent results from physical therapy and no need for pain medications. (*Id.* at 427).

On August 7, 2005, Plaintiff was discharged from physical therapy. (*Id.* at 200). The discharge report indicated that Plaintiff's trunk range of motion was within normal limits and without pain. (*Id.*). His lumbar spine mobility was pain free with minimal restrictions at L1–L3 and minimal to moderate restrictions at L4–S1. (*Id.*). Plaintiff's hamstring flexibility had improved to 75° on left and 80° on right. (*Id.*). In conclusion, the report noted that Plaintiff had obtained 100% of his long term goals and would begin working out at a local health club. (*Id.*).

On August 29, 2006, Plaintiff reported numbness in his left hand and some tightness in his left arm. (R. at 426). On examination, Nila Vora, M.D. found mild impairment of sensations over the index and middle finger on the palmar aspect of

---

[9] "[T]he straight-leg-raise test is the most sensitive test for lumbar disk herniation, with a negative result strongly indicating against lumbar disk herniation." <www.aafp.org/afp/2008/1001/p835.html>

the left hand; movements of the hand normal; no tenderness over the elbow or extensor tendons; and positive Phalen's maneuver on the left side.[10] (*Id.*). Dr. Vora diagnosed carpal tunnel syndrome (CTS) in the left hand due to repetitive movements. (*Id.* at 427). Plaintiff was advised to wear a wrist brace to see if the symptoms improve. (*Id.*).

On October 7, 2006, Plaintiff reported intermittent pain in his left anterior arm and forearm and paresthesias[11] in his hands with prolonged guitar playing and occasionally with walking, but no weakness in his arm or hands. (R. at 425). He noted some improvement with the wrist splints. (*Id.*). Dr. Ozark found normal strength in Plaintiff's arms, forearms, hands, fingers and shoulders, and normal range of motion in his shoulders, elbows, wrists and fingers. (*Id.*). Dr. Ozark diagnosed likely CTS and referred Plaintiff to a hand surgeon for evaluation. (*Id.*).

On November 14, 2006, Plaintiff saw Michael Bednar, M.D., an orthopedic surgeon and CTS specialist. (R. at 355). Plaintiff complained of pain in his elbow, mostly present in the lateral rather than ulnar aspect of the hand. (*Id.*). He reported some occasional numbness, and tingling to the middle, ring, and small fingers. (*Id.*). Dr. Bednar found minimal pain with radial tunnel palpation. (*Id.*). An elbow flexion

---

[10] Phalen's maneuver is a diagnostic test for carpal tunnel syndrome. <en.wikipedia.org/wiki/Phalen_maneuver>

[11] Paresthesia is "an abnormal sensation, such as of burning, pricking, tickling, or tingling." *Stedman's Medical Dictionary* 1031 (5th ed. 1982).

test and Tinel's sign[12] of the ulnar nerve of the elbow were both negative. (*Id.*). Dr. Bednar evaluated Plaintiff's electromyogram (EMG) results and diagnosed a mild ulnar neuropathy across the elbow. (*Id.*). He recommended treating with physical therapy. (*Id.*).

On December 5, 2006, Plaintiff completed an Activities of Daily Living Questionnaire. (R. at 99). He reported trouble using kitchen tools because of pain in his left hand. (*Id.*). He had difficulty carrying items because of pain in his back and left hand. (*Id.*). He also reported trouble reaching overhead because of numbness in his arms. (*Id.*). He sometimes had difficulty climbing stairs and getting out of the tub or shower. (*Id.* at 100). His knees and feet hurt from climbing stairs, and he can climb only two or three stairs at a time. (*Id.*). He uses a cane and sometimes needs assistance standing, walking, and balancing. Plaintiff reported no trouble washing or caring for his personal hygiene. (*Id.* at 99).

On January 13, 2007, Afiz Taiwo, M.D. performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 387–90). Dr. Taiwo found tenderness in Plaintiff's right foot and ankle but full range of motion without pain. (R. at 389). Plaintiff was able to get on and off the exam table without difficulty. (*Id.*). He could walk greater than 50 feet without support. (*Id.*). Plaintiff's gait was

---

[12] Tinel's sign is a method for detecting irritated nerves. "It is performed by lightly tapping (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve." <en.wikipedia.org/wiki/Tinel_sign>

nonantalgic without the use of assistive devices.[13] (*Id.*). He was able to perform toe/heel walk. (*Id.*). Plaintiff had normal range of motion in his cervical and lumbar spine, and a straight leg raise test was negative bilaterally. (*Id.*). Dr. Taiwo diagnosed bilateral lateral epicondylitis,[14] anterior tibiofibular ligament sprain, and elevated blood pressure. (*Id.* at 390).

On March 28, 2007, Plaintiff underwent an MRI on his cervical spine. (R. at 447–49). The MRI studies revealed moderate spinal canal stenosis, most prominent at the C4–5 level. (*Id.* at 449). There was moderate central canal stenosis resulting in mild myelomalacic change, including cord signal abnormality and cord enhancement. (*Id.*). There was also moderate neural foraminal stenoses bilaterally at the C3–4 and C4–5 levels, and on the right at the C5–6 level. (*Id.*).

On November 7, 2007, Plaintiff complained of weakness in his arm and shoulder so that he needs to rest his left arm and shoulder on door while driving. (R. at 424). On examination, Plaintiff had normal strength in his fingers, hands, forearms, arms, and shoulders, including rotator cuff strength. (*Id.*). Dr. Ozark opined that Plaintiff's weakness was related to spinal stenosis. (*Id.*). On November 30, 2007, Plaintiff's cervical, thoracic, and lumbar spine were normal, without tenderness,

---

[13] "Antalgic gait is a form of gait abnormality where the stance phase of gait is abnormally shortened relative to the swing phase. It can be a good indication of pain with weight-bearing." <en.wikipedia.org/wiki/Antalgic_gait>

[14] Lateral epicondylitis (tennis elbow) "is a condition in which the outer part of the elbow becomes sore and tender." <http://en.wikipedia.org/wiki/Tennis_elbow> If it occurs in both elbows, it is known as "bilateral lateral epicondylitis."
<www.hss.edu/conditions_tennis-elbow-overview.asp>

masses, or kyphoscoliosis. (*Id.* at 423). Dr. Ozark found that Plaintiff had full range of motion without any pain. (*Id.*).

On March 26, 2009, an MRI of Plaintiff's right knee indicated a tear of the posterior horn or the radial meniscus and a small joint infusion. (R. at 162). However, Plaintiff's knee joint alignment, bone marrow signal, and medial and lateral collateral ligaments were all normal. (*Id.*). Plaintiff's ligaments and tendons were intact. (*Id.*).

On March 29, 2009, Plaintiff filled out an Adult Function Report. (R. at 121). He reported that he plays guitar a lot, and can walk only one-half block before needing a few minute's rest. (*Id.* at 121, 126).

On April 20, 2009, Richard Bilinsky, M.D., a state-agency medical consultant, completed a physical RFC assessment. (R. at 455–62). He reviewed the medical record, found Plaintiff partially credible, and opined that Plaintiff was capable of light work beginning on January 13, 2004. (*Id.* at 462). Dr. Bilinsky concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk less than 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (*Id.* at 456). He limited Plaintiff to occasional balancing, kneeling, crouching, and crawling due to his cervical stenosis. (*Id.* at 457). On June 1, 2009, James L. Greco, M.D., another state-agency medical consultant, affirmed Dr. Bilinsky's opinion. (*Id.* at 471).

At the administrative hearing held on the February 8, 2011, Plaintiff testified that he has never fully recovered from his injury, and still experiences a reduced

range of motion. (R. at 510–11). He can be on his feet for only 10–30 minutes at a time. (*Id.* at 511). He has a constant burning pain in his foot, related to nerve damage. (*Id.* at 512). He testified that it varies how often he has to take pain medication, but that he has learned to manage the pain by controlling his activities. (*Id.* at 518).

The ME testified that from December 17, 2002, through January 12, 2004, Plaintiff medically equaled Listing 1.02(A). (R. at 528–29). The ME found medical improvement beginning on January 13, 2004. (*Id.* at 524–25, 528–29). After that date, Plaintiff was capable of performing light work. (*Id.* at 528–29).

# V. DISCUSSION

Plaintiff raises three arguments in support of his request to reverse and remand: (1) the ALJ erred when finding that Plaintiff was no longer disabled as of January 13, 2004; (2) the ALJ erred when determining Plaintiff's RFC; and (3) the ALJ erred when determining Plaintiff's credibility. (Mot. 10–23). The Court addresses each argument in turn.

## A. Substantial Evidence Supports ALJ's Medical Improvement Analysis

Plaintiff asserts that the ALJ erred when finding that he had medically improved as of January 13, 2004. (Mot. 10–14). Medical improvement is defined by the regulations as "any decrease in the medical severity of [the claimant's] impairment(s)" since the most recent decision finding the claimant to be disabled, which is based on "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." 20 C.F.R. § 404.1594(b)(1); *accord*

*Blevins v. Astrue*, 451 F. App'x 583, 585 (7th Cir. 2011). "Medical improvement . . . is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(c)(1); *accord Delph v. Astrue*, 538 F.3d 940, 947 (7th Cir. 2008). "When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date." *Lymperopulos v. Astrue*, No. 09 C 1388, 2010 WL 960340, at *7 (N.D. Ill. Mar. 10, 2010).

The ALJ initially found Plaintiff disabled because the severity of his right ankle injury and knee post-surgery equaled the criteria of Listing 1.02(A). (R. at 21–22). The ALJ then compared Plaintiff's prior and current medical evidence to determine whether there were changes associated with his impairments. (*Id.* at 22). She found medical improvement beginning on January 13, 2004, because on that date, Plaintiff's "treating orthopedic specialist and surgeon, Dr. Armen Kelikian, indicated that he could return to work [and that Plaintiff] was at maximum medical improvement." (*Id.*). After careful review, the Court finds that the ALJ's determination is supported by substantial evidence.

On December 17, 2002, Plaintiff sustained a work-related injury when an I-beam rolled over onto his right leg. (R. at 22, 508, 510). The injury required physical therapy and then two surgeries, one to his right ankle and the other to his right knee. (*Id.* at 22, 163, 170–72, 489–91). Subsequent to his surgeries, Plaintiff participated

in additional physical therapy and medication management for his pain. (*Id.* at 22, 479–88). Thereafter, on January 12, 2004, Dr. Kelikian, Plaintiff's treating orthopedic specialist and surgeon, found full range of motion and strength in Plaintiff's foot and ankle, along with a normal neurological examination. (*Id.* at 477). He concluded that Plaintiff was at MMI and could return to work. (*Id.* at 22, 477–78). On March 8, June 4, and September 10, 2004, Dr. Kelikian reiterated his opinion that Plaintiff was at MMI and could return to work. (*Id.* at 473, 475, 476). Dr. Kelikian's opinion was supported by the ME. After reviewing the medical record, the ME found medical improvement beginning on January 13, 2004. (*Id.* at 524–25, 528–29). Similarly, the DDS physicians found medical improvement after January 12, 2004. (*Id.* at 462, 471).

Plaintiff contends that "the ALJ improperly relied on an ambiguity in Dr. Kelikian's opinion to find that [his] disability had ended." (Mot. 11). Dr. Kelikian reported that Plaintiff "could return to work within FCE guidelines/restrictions, medium, sedentary functional demand level." (R. at 478). Plaintiff argues that "inclusion of the word 'sedentary' is significant because if [he] were limited to sedentary—as opposed to light exertional work—he would be found disabled according to the Medical-Vocational Guidelines." (Mot. 11). Plaintiff contends that the ALJ should have recontacted Dr. Kelikian to clear up this ambiguity before relying on his opinion. (*Id.*).

The applicable regulations require an ALJ to recontact a treating physician when the evidence received "is inadequate for [her] to determine whether [the

claimant is] disabled." 20 C.F.R. § 404.1512(e); *see also* Social Security Ruling (SSR)[15] 96-5p (stating if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). The regulations also state that an ALJ will seek additional evidence or clarification when: (1) the report from the treating physician contains a conflict or ambiguity that must be resolved; (2) the report does not contain all the necessary information; or (3) the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e)(1); *accord Brown v. Astrue,* No. 10 C 2153, 2012 WL 280713, at *17 (N.D. Ill. Jan. 30, 2012). Here, there was no reason to recontact Dr. Kelikian. Dr. Kelikian clearly indicated, in a contemporaneous progress note, that Plaintiff had full range of motion and strength and that the FCE found Plaintiff capable of returning to his job as an iron worker, at medium-level duty. (R. at 477). And, regardless of Plaintiff's RFC, Dr. Kelikian's findings clearly evinced a "decrease in the medical severity of [Plaintiff's] impairment(s)." *See* 20 C.F.R. § 404.1594(b)(1). Moreover, after examining the record, the ME and the DDS doctors agreed that Plaintiff demonstrated medical improvement as of January 12, 2004. (*Id.* at 462, 471, 524–25, 528–29).

---

[15] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel,* 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue,* 559 F.3d 736, 744 (7th Cir. 2009).

Plaintiff also argues that the ALJ erred because "she did not explain why [his] impairments ceased to medically equal Listing 1.02(A) after January 12, 2004." (Mot. 13). Plaintiff contends that although he may have achieved MMI as of January 12, 2004, "he experienced residual pain in his right ankle and foot through the entire relevant period." (*Id*. 12). But pain alone does not medically equal Listing 1.02(A). Instead, Listing 1.02(A) requires gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the hip, knee, or ankle, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint, resulting in the inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02. The regulations define "inability to ambulate effectively" as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id*. § 1.00(B)(2)(b) (citation omitted). Here, Plaintiff provides no medical evidence that he was unable to ambulate effectively as of January 12, 2004. Indeed, on January 12, March 8, and June 4, 2004, Dr. Kelikian found that Plaintiff had full range of motion and strength in his ankle. (R. at 475–77). Similarly, on February 28, April 5, and May 20, 2005, Dr. Arnold found Plaintiff able to ambulate without difficulty and 5/5 strength in his lower extremities. (*Id*. at 342, 343, 345).

In sum, while there is no doubt that Plaintiff continued to suffer from severe impairments related to the surgeries on his right ankle and knee, there is substantial evidence in the record to support the ALJ's decision that medical improvement oc-

curred after January 12, 2004, such that he no longer met a listing. *See Delph*, 538 F.3d at 947.

## B. Substantial Evidence Supports ALJ's RFC Determination

The ALJ determined that beginning on January 13, 2004, Plaintiff's status post-surgeries of his right knee and right shoulder and degenerative disc disease of his thoracic and cervical spine were severe impairments. (R. at 20). However, after examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that beginning on January 13, 2004, Plaintiff had the RFC to perform light work,[16] but can never climb ropes, ladders, or scaffolds; cannot reach overhead; can only occasionally climb ramps and stairs, balance, kneel, crouch or crawl; and must avoid heights and moving machinery. (*Id.* at 23). Plaintiff argues that the ALJ erred in this determination by failing to include limitations for his carpal tunnel syndrome (CTS) and occasional need for a cane, and by failing to explain how an RFC finding of light work accommodated Plaintiff's back conditions. (Mot. 15–17).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of

---

[16] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Plaintiff's testimony. The ALJ explicitly considered Plaintiff's CTS and found that his physical activities, including playing guitar, driving, and performing daily household activities, and lack of treatment support that Plaintiff's CTS was a nonsevere impairment with minimal effect on Plaintiff's ability to work. (R. at 21). Moreover, the ALJ noted that a November 2007 physical examination demonstrated normal strength in Plaintiff's fingers, hands, forearms, arms, and shoulders, including rotator cuff strength. (*Id.*; *see id.* at 424).

Similarly, in October 2006, Dr. Ozark found normal strength in Plaintiff's arms, forearms, hands, fingers and shoulders, and normal range of motion in his shoulders, elbows, wrists and fingers. (*Id.* at 425). The ALJ also cited to Plaintiff's November 2006 EMG, which indicated only a mild ulnar neuropathy across the elbow. (*Id.* at 21; *see id.* at 355).

Plaintiff contends that the ALJ failed to consider the positive Phalen's maneuver by Dr. Vora in October 2006. (Mot. 15; *see* R. at 426). But despite the positive Phalen's sign, Dr. Vora found only mild impairment of sensations over Plaintiff's index and middle finger on the palmar aspect of the left hand, movements of the hand normal, and no tenderness over the elbow or extensor tendons. (R. at 426). And the ALJ noted that less than a month later, an elbow flexion test and Tinel's sign of the ulnar nerve of Plaintiff's elbow performed by Dr. Bednar, an orthopedic surgeon and CTS specialist, were both negative. (*Id.* at 21; *see id.* at 355). In any event, the ALJ explicitly accommodated Plaintiff's minor CTS symptoms by limiting his RFC "to light work with no overhead reaching." (*Id.* at 21; *see id.* at 26).

The ALJ properly rejected Plaintiff's contention that he occasionally needs a cane to ambulate. Plaintiff testified that he sometimes uses a cane if he's going to "be on [his] feet more than [he feels he] should but not very often." (R. at 513). The ALJ considered Plaintiff's testimony but rejected it as inconsistent with the evidence:

> The medical evidence and treatment do not support his inability to stand for longer than twenty minutes or walk for extended periods. He has consistently been able to ambulate after 2004 without use of [an] assistive device. He reported that he has orthotics but does not use

them on a consistent basis. He only reported occasional need to use
Ibuprofen or his cane.

(*Id.* at 25–26). Other than his testimony, Plaintiff has provided no medical evidence

for his purported need to use a cane to ambulate effectively.[17] Indeed, on April 8,

2005, Dr. Arnold found Plaintiff able to ambulate without difficulty. (*Id.* at 343). On

May 20, 2005, Plaintiff reported being able to ambulate in stores and do some yard

work without difficulty. (*Id.* at 342). On November 21, 2005, Plaintiff reported being

able to perform daily activities without any problems. (*Id.* at 341). On January 13,

2007, Plaintiff had full range of motion without pain; he was able to perform

toe/heel walk, could walk greater than 50 feet without support, and his gait was

nonantalgic without the use of assistive devices. (*Id.* at 389).

Finally, the ALJ considered Plaintiff's back conditions when finding him capable

of a limited range of light work. The ALJ found that Plaintiff's degenerative disc

disease of the thoracic and cervical spine were severe impairments. (R. at 20). The

ALJ considered Plaintiff's complaints of back pain but noted that by April 2005, he

was not taking any pain medications and had successfully completed a physical re-

habilitation regimen. (*Id.* at 24). While Plaintiff reported minimal stiffness, it was

relieved with exercise. (*Id.*). Diagnostic testing in March 2005 indicated only mild

degenerative changes in the thoracic spine with mild compression deformities in at

least two of the mid thoracic vertebral bodies. (*Id.*; *see id.* at 372). In January 2007,

Plaintiff was able to get on and off the exam table without difficulty, he had normal

---

[17] Plaintiff did report using a cane in September 2003. (R. at 127). But this was during
the time period when the ALJ found Plaintiff disabled. (*Id.* at 22).

range of motion in his cervical and lumbar spine, and a straight leg raise test was negative bilaterally. (*Id.* at 25; *see id.* at 389). In March 2007, diagnostic tests revealed some moderate spinal canal stenosis. (*Id.* at 25; *see id.* at 449). In November 2007, an examination of Plaintiff's spine was normal without tenderness, and he had full range of motion without pain. (*Id.* at 423; *see id.* at 24).

In June 2009, Dr. Greco, the state-agency consultant, examined the medical record and concluded that Plaintiff was capable of a limited range of light work. (R. at 471). Dr. Greco acknowledged that the medical record includes an MRI showing moderate spinal stenosis at C4-5 and moderate neuroforaminal stenosis bilaterally from C3–6. (*Id.*). Nevertheless, Dr. Greco found that the record "does not contain clinical data relevant to this MRI finding that would establish a functional impairment." (*Id.*).

The ME testified that the medical record shows degenerative disc disease from C4–7, significant radiological abnormality at C4–5, and degenerative changes in the cervical spinal column at C4–5. (R. at 527). The ME noted that the January 2007 consultative examination and the November 2007 examination by Plaintiff's primary physician were normal. (*Id.* at 527–28). Thus, the ME concluded that Plaintiff's "impairment is a significant severe radiological abnormality with no clinical effect." (*Id.* at 527).

The ALJ gave great weight to the opinions of the ME and the state-agency consultants. (R. at 26). These opinions support the ALJ's conclusion that Plaintiff's back conditions render him capable of a limited range of light work. There is no

support for Plaintiff's contention that the ALJ failed to explain how an RFC finding of light work accommodated Plaintiff's back. The ALJ carefully analyzed the evidence to arrive at the maximum that Plaintiff can still do despite his back conditions. *Craft*, 539 F.3d at 675–76. Although the medical evidence indicates that Plaintiff has degenerative disc disease of the thoracic and cervical spine, the ALJ found no clinical evidence of disability. Plaintiff has not identified any medical evidence to the contrary.

In sum, the Court finds that the ALJ did not err in her determination of Plaintiff's RFC. The ALJ fulfilled her responsibility to determine Plaintiff's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case), *5 (The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence."). Substantial evidence supports the ALJ's determination that Plaintiff can perform a limited range of light work.

## C. Substantial Evidence Supports ALJ's Credibility Determination

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 18–23). He asserts that the ALJ's decision failed to credit his ongoing management for his various conditions, did not explain

how Plaintiff's ability to walk without a cane demonstrates an ability to stand for longer than 20 minutes, placed undue weight on Plaintiff's ability to perform household chores, and failed to consider his work history. (*Id.*).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms. SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(b). "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(c). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's]

testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. "[W]hen a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors, [the Court has] greater leeway to evaluate the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942. "An erroneous credibility finding requires remand unless the claimant's testimony

is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 13-1525, 2014 WL 104158, at *4 (7th Cir. Jan. 13, 2014).

At the hearing, Plaintiff testified that his pain limits him to being on his feet for only 10–30 minutes at a time. (R. at 511). He has constant burning sensations in his foot. (*Id.* at 512). Plaintiff also has pain in his lower left back that he attributes to the way he walks. (*Id.* at 515). "Sometimes" he uses a cane if he's "going to be on [his] feet more than [he feels he] should but not very often." (*Id.* at 513). On occasion he needs to use a chair for support. (*Id.*). He avoids climbing stairs if an elevator is available. (*Id.* at 514). He limits his driving to once or twice a week because of the burning sensation in his foot. (*Id.* at 514, 522–23). He is no longer able to shop, and is limited in his ability to do household chores and yard work. (*Id.* at 511–12). He can spend 15–20 minutes mowing his lawn before its gets too painful. (*Id.* at 518–19). He used to garden more often than he does now. (*Id.* at 523). He is only capable of lifting about five pounds. (*Id.* at 516). About four to five times a month, he takes ibuprofen for the pain. (*Id.* at 517–18, 521). His pain is typically 2–3 out of 10, and will go up to 5–6 if he overdoes it. (*Id.* at 520). He controls his pain level by limiting his activities. (*Id.*).

The ALJ found Plaintiff not fully credible to the extreme limitations that he described:

> I give his testimony and reported functional limitations some weight but find his limitations inconsistent with his ability to engage in extensive physical activities as indicated in the record and in his testimony. I also find his limited, conservative and sporadic treatment not

consistent with his severe complaints and inability to walk or stand for
any length of time with numbness in his arms or hands.

(R. at 26). Specifically, the ALJ found that Plaintiff's gaps in treatment, incon-

sistent use of pain medications, medical examinations, and physical activities un-

dermined his allegations of severe functional limitations and pain:

> [Plaintiff] has not had any consistent and ongoing medical manage-
> ment for his various conditions with pain symptoms since 2004 and
> through 2008. He had gaps in treatment and took mostly Ibuprofen,
> but not even on a consistent basis, as noted in the medical records and
> affirmed by [Plaintiff]. His lack of consistent pain medications with
> gaps in treatment undermines his severe functional limitations and
> pain. The medical evidence and treatment do not support his inability
> to stand for longer than 20 minutes or walk for extended periods. He
> has consistently been able to ambulate after 2004 without use of assis-
> tive device. He reported that he has orthotics but does not use them on
> a consistent basis. He only reported occasional need to use Ibuprofen or
> his cane. His physical examinations showed some limitations but
> [were] not supportive of his extreme limitations. His physical activities
> such as changing tires, doing yard work, attending a musical festival
> with a great deal of walking is inconsistent with his inability to work.
> [Plaintiff] has extensive physical activities that are consistent with the
> residual functional capacity assessed. [Plaintiff] drives, plays guitar,
> does household maintenance, chores and spends time with his grand-
> daughter.

(*Id.* at 25–26). Nevertheless, the ALJ found Plaintiff partially credible and conclud-

ed that his impairments do affect his ability to work:

> Thus, I reduced him to a lower physical exertional level than his past
> work and limited him to light work. I added postural and environmen-
> tal limitations that accommodate his ankle, knee and cervical stenosis.
> Even though I considered his shoulder and CTS non-severe impair-
> ments, I considered these conditions when limiting him to light work
> with no overhead reaching.

(*Id.* at 26).

Plaintiff contends that "the ALJ erred in finding that [Plaintiff] had not had con-

sistent and ongoing management for his 'various conditions with pain symptoms."

(Mot. 18). Plaintiff argues that he "*did* have ongoing management for his various conditions," citing to treatment for right ankle posterior tibial tendinosis, deltoid ligament calcification and coronary heart disease, studies indicating spinal canal stenosis in the cervical spine, degenerative changes in the thoracic spine, and ulnar neuropathy across the elbow, and physical therapy. (*Id.*). Plaintiff misapprehends the ALJ's analysis. The ALJ is not discounting Plaintiff's allegations of pain because of a general lack of treatment. Instead, the ALJ clearly states that Plaintiff's lack of *consistent pain medications* and *gaps* in treatment undermine his allegations that he is incapable of even a limited range of light work. (R. at 25). As the ALJ noted, Plaintiff seldom complained to his doctors of anything more than mild to moderate pain. (*Id.* at 24–25, *see, e.g., id.* at 477 (mild pain in January 2004), 476 (mild discomfort in March 2004), 473 ("doing well" in September 2004), 346 (some tenderness in January 2005), 343 (some tenderness with less pain in March 2005), 427 (pain free with physical therapy in April 2005), 342 (able to ambulate and do some yard work pain-free in May 2005), 340 (able to perform daily activities without problems in November 2005), 200 (discharged from physical therapy pain free in August 2005), 425 (intermittent pain in left arm and hands in October 2006), 355 (minimal pain in November 2006), 389 (tenderness but full range of motion without pain in January 2007), 423 (full range of motion without pain in November 2007)). Similarly, the ALJ found that Plaintiff needed mild pain medications only on an inconsistent basis. (*Id.* at 24–25, *see, e.g., id.* at 427 (pain medications not needed in April 2005), 426–27 (prescribed Ultram in July 2006 but six weeks later taking only aspi-

rin and ibuprofen), 388 (taking only aspirin and ibuprofen in January 2007)). And, between July 2006 and April 2008, Plaintiff had only sporadic appointments with his primary care physician, with an eight-month gap in 2007, complaining chiefly of cough, ringing in ears, and shoulder pain. (*Id.* at 423–27). Thus, Plaintiff's mild complaints of pain, conservative pain medications, and sporadic treatments support the ALJ's conclusion that Plaintiff's complaints of debilitating pain are not entirely credible. *See Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012) (in discounting claimant's testimony that he needs to lie down several times a day, the ALJ considered a broad range of factors, including his medical records, treatment history, and daily living activities).

Plaintiff contends that the ALJ failed to discuss his testimony that he needed ibuprofen only on an as-needed basis because he structured his day to avoid activities that would cause pain. (Mot. 19). On the contrary, the ALJ specifically acknowledged Plaintiff's testimony (R. at 23–24), but rejected it because it was contrary to the medical records (*id.* at 25–26). The records do not support Plaintiff's contention that he was avoiding daily activities. In May 2005, Plaintiff reported being able to ambulate in stores and do some yard work without difficulty. (*Id.* at 342; *see id.* at 24). After completing a physical therapy regimen, Plaintiff achieved his goals and was pain-free. (*Id.* at 200, 427; *see id.* at 24). On examination, Plaintiff frequently exhibited full range of motion with little, if any, pain. (*Id.* at 340, 343, 345, 389, 425, 426, 428, 475, 477; *accord id.* at 23–25).

Next, Plaintiff asserts that "the ALJ erred in finding [Plaintiff's] allegations of difficulties standing for more than 20 minutes not credible." (Mot. 19). Plaintiff contends that the ALJ relied solely on Plaintiff being able to consistently ambulate without use of an assistive device, ignoring that Dr. Arnold reported that Plaintiff had an inability to tolerate long periods beyond 20 minutes of standing and walking. (*Id.* 19–20). Plaintiff misapprehends the ALJ's conclusions. The ALJ found Plaintiff's inability to stand for more than 20 minutes incredible because of a number of factors, including Plaintiff's ability to ambulate without an assistive device, failure to use his orthotics on a consistent basis, only occasional need for cane and ibuprofen, and physical examinations indicating only minor limitations. (R. at 25–26). Indeed, as described above, Plaintiff seldom complained of anything more than mild to moderate pain, needed only minor pain medications on an occasional basis, often reported being able to ambulate effectively and to complete daily activities, and consistently exhibited full range of motion without pain. While Plaintiff did complain to Dr. Arnold that he was able to ambulate only for 20 to 25 minutes without pain, on examination Dr. Arnold found some tenderness but no erythema, warmth, or swelling. (*Id.* at 340). Plaintiff had normal flexion and extension, normal inversion and eversion, and no pain with resisted inversion and eversion. (*Id.*). And, in the January 2007 consultative examination, Plaintiff could walk greater than 50 feet without support, his gait was nonantalgic without use of an assistive device, and he was able to toe/heel walk. (*Id.* at 389; *see id.* at 25). "In rendering a decision, an ALJ must build a logical bridge from the evidence to his conclusion, but he need

not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citation omitted).

Plaintiff also complained that "the ALJ erred in finding that [Plaintiff's] activities of daily living undermined his credibility." (Mot. 21). Plaintiff argues that contrary to Seventh Circuit precedent, the ALJ placed undue weight on Plaintiff's abilities to perform household chores. (*Id.*). The Seventh Circuit has often criticized ALJs for rejecting credibility based solely on activities of daily living. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("her ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace"); *Clifford*, 227 F.3d at 872 (performing household chores in a two-hour interval, cooking, shopping, vacuuming, and watching grandchildren not inconsistent with disability). But here the ALJ is not discounting Plaintiff's credibility merely because of his daily activities. Instead, the ALJ found Plaintiff's physical activities of changing tires, doing yard work, attending a musical festival with a good deal of walking, driving, playing guitar, doing household maintenance and chores, and playing with his granddaughter are inconsistent with someone who claims that are incapable of performing even a limited range of light work. (R. at 26). In any event, even if the ALJ erred in this portion of her credibility

analysis, it would not be subject to remand. The credibility determination standard of review is "extremely deferential" and will not be reversed where the ALJ provides "some evidence supporting her determination." *Bates*, 736 F.3d at 1098.

Finally, Plaintiff's assertion that "the ALJ improperly failed to consider [Plaintiff's] work history in her credibility analysis" (Mot. 22) is belied by the record. The ALJ summarized Plaintiff's work history and stated that she took it into account in evaluating Plaintiff's credibility. (R. at 25). While Plaintiff may not agree with the ALJ's findings, the ALJ's failure to provide a more detailed analysis does not undermine her conclusions.[18]

In sum, the ALJ concluded that, when viewed together, Plaintiff's daily activities, treating physicians' opinions, conservative pain management, and gaps in treatment undermined Plaintiff's credibility when describing his pain and disability. "These are exactly the type of factors the ALJ was required to consider." *Pepper*, 712 F.3d at 369. The ALJ provided specific reasons for her credibility finding, supported by substantial evidence. *Moss*, 555 F.3d at 561; *Steele*, 290 F.3d at 942. The ALJ built a logical bridge between the entire case record—including the medical evidence, Plaintiff's statements, and other relevant evidence—and her conclusion. *Schideler*, 688 F.3d at 312; *Arnold*, 473 F.3d at 823; SSR 96-7p.

---

[18] Plaintiff also contends that the ALJ should have considered the state agency physicians' conclusions that Plaintiff was credible. (Mot. 22–23). But one of the state agency physicians found Plaintiff only *partially* credible, and both physicians found Plaintiff capable of performing light work beginning on January 13, 2004. (R. at 462, 471). Moreover, the Court "afford[s] [the ALJ's] credibility determinations special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Because the ALJ was in a position to observe Plaintiff at the hearing—and the state agency physicians were evaluating only the written record—the ALJ was "in the best position to see and hear [Plaintiff] and assess [his] forthrightness." *Id.*

## V. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **AFFIRMED**.

E N T E R:

Dated: February 4, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge